FILED
CLERK

3:15 pm, Aug 03, 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ADAM SENESE,

                    Plaintiff,

          -against-

LONGWOOD CENTRAL SCHOOL
DISTRICT, along with LAURA HOPKINS,
CARA CHUDYK, and JANINE ROZYCKI, *in*
*their individual capacity as aiders and abettors*,

                  Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:15-cv-07234 (ADS)(AYS)

<u>**APPEARANCES:**</u>

**Zabell & Associates, P.C.**
*Counsel for the Plaintiff*
1 Corporate Drive, Suite 103
Bohemia, NY 11716
        By:    Saul D. Zabell, Esq., Of Counsel

**Sokoloff Stern LLP**
*Counsel for the Defendants*
179 Westbury Avenue,
Carle Place, NY 11514
        By:    Adam I. Kleinberg, Esq.,
                  Kaitlyn R. McKenna, Jr., Esq., Of Counsel

**SPATT, District Judge**:

On December 18, 2015, the Plaintiff Adam Senese (the "Plaintiff" or "Senese") brought this federal discrimination action against the Defendants, Longwood Central School District ("LCSD" or the "District"), along with Laura Hopkins ("Hopkins"), Cara Chudyk ("Chudyk"), and Janine Rozycki ("Rozycki (collectively, the "Defendants"), alleging gender-based discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

("Title VII"), and the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL"), based on the Plaintiff's suspension and termination from his position as a probationary special education teacher with the District.

Presently before the Court is a motion for summary judgment filed by the Defendants, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56 seeking to dismiss the complaint.

# I. BACKGROUND

Unless otherwise noted, the following facts are undisputed and are drawn from the parties' Local Rule 56.1 statements.

## A. THE FACTUAL BACKGROUND

### 1. The Plaintiff's Teaching Background

The Plaintiff is a male who is approximately 6'2" and weighs roughly 250 pounds. Prior to working for the District, Senese worked for Eastern Suffolk Board of Cooperative Educational Services ("BOCES"). In 2009, after graduating from college, the Plaintiff began work as a substitute teaching assistant at BOCES. In the fall of 2010, he was hired as a full-time teaching assistant. Three years later, Senese received tenure as a teaching assistant at BOCES. That same year, 2013, he also obtained a New York State teaching certification. Senese is certified to teach elementary students from grades one through six and disabled students from grades one through six. During the course of his employment with BOCES, the Plaintiff became certified in Nonviolent Crisis Prevention ("NCP") at the Crisis Prevention Institute ("CPI").

In June 2013, the Plaintiff applied for a teaching position with the District, a public school district located in Suffolk County. On his employment application, the Plaintiff noted his CPI training. Chudyk, a District teaching assistant with LCSD since 2007, also applied for the same

position but was subsequently rejected.  The Plaintiff was selected for an initial interview, which was conducted by a panel composed of female employees.  He then performed a lesson to a group of special education students for Scott Schuster ("Schuster"), the Director of Elementary Special Education, Yvette Tilley, a school principal, and Jen McCarthy, a Director of Secondary Special Education.  Following the lesson, the Plaintiff was interviewed by Kevin McCarthy, an Assistant Superintendent for Human Resources ("AS McCarthy"), and Debra Winter, the Assistant Superintendent for Pupil Services.  At some point thereafter, AS McCarthy called the Plaintiff to offer him a probationary teaching position with the District.  Neither side contends that gender was a factor during the hiring process.

The Plaintiff accepted the position and was assigned to work as a special education teacher at Ridge Elementary School ("Ridge"), one of the District's four elementary schools, for the 2013-2014 school year.  Senese was subject to a two-year probationary period with the District, rather than the typical three-year period because of at the time of his hire, he was a tenured employee with BOCES.  Ridge contained students in kindergarten through fourth grade in addition to special education classes of various ages.  At all relevant times, Rozycki was employed as Ridge's Principal and Hopkins was employed as Assistant Principal.  In 2010, Hopkins received her CPI certification, but by the 2014-2015 school year, it had lapsed.

### 2.  The 2013-2014 School Year

Specifically, the Plaintiff was assigned to teach developmentally disabled students from grades three through five in the District's Alternative Learning Program ("ALP").  ALP contained developmentally and intellectually disabled students.  Students were assigned to ALP based on the recommendations of the District Committee of Special Education and typically remained in the program until twenty-one years of age.  ALP included students with severe disabilities.  During

the 2013-2014 school year, the Plaintiff's class was originally assigned eight students, but later in the year, that number decreased to seven. Senese had one teaching assistant, Melissa Lopez ("Lopez") in addition to four, one-to-one aides who were assigned to assist individual students on a daily basis. One of those one-to-one aides was Vanessa Holzhauser ("Holzhauser"). The Plaintiff reported to Schuster, Rozycki, and Hopkins. Throughout the year, Schuster and Rozycki conducted multiple classroom observations and performance evaluations and did not indicate any problems with Senese's performance.

During the Plaintiff's deposition, he testified that he did not recall any incidents during his first year with the District where he physically restrained a student. Hopkins testified that at some point during the school year, she witnessed the Plaintiff bring Student R, a male student, into the bathroom, and observed him in the stall with the student. When Hopkins inquired as to why he was assisting Student R with toileting, Senese explained that female aides were uncomfortable doing so as the student recently "discovered himself." Hopkins testified that she told Senese: "[J]ust as I would tell anybody, please step into the threshold of the bathroom and not be in the stall with him because, again, you're putting yourself at risk as misinterpretation as to why you're in the stall with him." The Plaintiff did not recall this incident.

At the conclusion of the 2013-2014 school year, the Plaintiff was asked to return for his second and final probationary year.

### 3. The 2014-2015 School Year

The Plaintiff's class for the 2014-2015 school year consisted of seven students, with three of his students returning from the previous year, and four new students. Lopez was no longer the Plaintiff's teaching assistant as she was promoted to a teaching position in the District before the new school year. The District replaced her with Chudyk, who had worked in the District for eight

years.  Chudyk had previously applied for a position within the District as a teacher and at that point was unsuccessful in attaining such a position.  Many of Senese's one-to-one aides returned from the prior year.  His new aides included Gina Grasso ("Grasso") and David Glover ("Glover").  Senese was also joined every morning by Tara Rider ("Rider"), a vision teacher, who spent approximately one to two hours with a visually-impaired student in his class.

In February 2015, the Plaintiff was sent by the District for CPI training, which consisted of a three-day, off-site course.  He joined Scott Jackson ("Jackson"), a speech teacher at Ridge, Diane Porter, an ALP teacher, and JoMara Lopez, a District administrator, as representatives of the District at CPI training.  After attending the training, the Plaintiff discussed what he had learned with AS McCarthy.  Later that spring, the Plaintiff was invited by Schuster to attend the District's Aspiring Administrator Academy ("AAA").  AAA is a District-wide initiative to identify teachers that demonstrate leadership abilities and train them for future careers as administrators with the District.

Prior to February of 2015, the Plaintiff did not physically restrain any students, nor did he witness any other teachers doing the same.  Further, at that time, to the Plaintiff's knowledge, no aides or teaching assistants had ever employed such methods in his classroom.

### 4. Incidents of Physical Restraint

Between February 2015 and April 2015, the Plaintiff was involved in at least two incidents with Student B where she had to be restrained physically.  Student B was a disabled student in Renee Mintel's ("Mintel") class.  Mintel was another ALP teacher at Ridge during the relevant time period.  The first incident occurred when Mintel called the Plaintiff into her classroom to help restrain Student B, who was acting physically aggressive.  During his deposition, Senese testified

that only himself, Mintel, and Student B were present in the classroom at the time of the incident and that he does not recall the specifics of what occurred that day.

In the second incident, Mintel called both the Plaintiff and Jackson to assist with physically restraining Student B. The Plaintiff's deposition revealed that he did not recall any of the specifics of the incident, including who else was in the classroom at the time, Student B's behavior, or how he and Jackson physically restrained her. In one of the incidents, Student B was in the process of physically attacking Mintel by the time he arrived. Mintel had sent for the Plaintiff when the altercation began, and one of Mintel's aides found and retrieved the Plaintiff soon after. Senese utilized a defensive CPI technique which involves holding the student's wrist with one hand and using the other hand to protect your body. Rozycki was present for one of the above-mentioned incidents and witnessed the Plaintiff and Jackson use a "team hold" to physically restrain Student B.

During the Plaintiff's deposition, he recalled bringing Student B into a conference room to help calm her down, although he could not remember if it was part of the above-mentioned incidents, or if it occurred during the course of a separate incident. It was Mintel's decision to move her to the conference room.

On Wednesday, April 22, 2015, Hopkins observed the Plaintiff, Student B, Mintel, another teacher, and a security guard walking down a hallway and entering a conference room. The Plaintiff and Student B entered the conference room while the rest of the staff members remained outside. Mintel had called Senese for assistance when Student B began protesting about doing class work and otherwise disrupting the class. Hopkins testified that she witnessed the Plaintiff extending Student B's arm while giving her instructions to sit "in a very forceful manner." At that point, Student B crawled under the conference table. Stephanie Columbia ("Columbia"), the

District social worker, eventually coaxed Student B out from under the table. Hopkins dismissed the Plaintiff and she and Columbia stayed with Student B until she calmed down and was able to return to the classroom. Based on the record, it is unclear if this incident is separate and distinct from the two above-mentioned incidents.

### 5. The Investigation

On Monday, April 27, 2015, Hopkins spoke with Columbia concerning what she observed on April 22, 2015, noting that she did not believe that the situation required the use of CPI or any other physical restraint. Columbia suggested that Hopkins speak with Rozycki regarding her concerns. That same day, Hopkins had a discussion with Rozycki regarding her concern about a recent interaction between the Plaintiff and a student that she had observed. Rozycki testified that Hopkins' account left her concerned, so she suggested that Hopkins speak with the Plaintiff to see if the restraint technique used was one which he was recently trained to perform.

Later that day, Hopkins spoke to the Plaintiff in a conference room near the school office about what she witnessed on April 22, 2015. The Plaintiff did not recall Hopkins being present at any incident involving Student B, so he inquired as to an incident date to refresh his recollection. Hopkins refused to give the Plaintiff a date. Although Senese could not discuss with Hopkins what specifically happened, as he did not recall it, he assured Hopkins that he always used proper CPI techniques in every interaction with students. Hopkins noted that she did not recall learning about the technique used on April 22, 2015 in her own CPI training.

At some point in the conversation, Hopkins testified that she told the Plaintiff, "We are adults. These are young elementary age children. You're a big guy. She's a young girl. When you were doing that maneuver and she was saying ouch, don't put yourself in harm's way. Don't put her in harm's way." While the Plaintiff did not recall his response, Hopkins testified that

Senese repeated "gotcha." Senese testified that Hopkins told him that "as a man in the school you has to be that much more careful than anybody else. … [A]s a big guy, … [you] should be more careful in [your] actions. And then [Hopkins] went on to say that even regarding taking students to the bathroom, that it was inappropriate for a man to take a student to the bathroom." It is not clear if Hopkins was referring to the incident she claimed to witness during the 2013-2014 school year. The Plaintiff did not know which incident, if any, Hopkins was referring to during the conversation. Overall, the conversation between Hopkins and the Plaintiff lasted a few minutes.

Hopkins reported to Rozycki that she spoke with the Plaintiff about what she witnessed and discussed her concerns. Rozycki testified that Hopkins "explained … that she spoke to [Senese] in our conference room. That she conveyed what she had seen and her concern. [Rozycki] believed, there were some … questions to [Senese] about the CPI training. [S]he may have indicated to [Senese] that many years ago she had been CPI trained and she had not seen that [type of restraint]. She felt that it is concerning. The student was saying ouch and [Senese] needed to be careful."

Approximately one hour after speaking with Hopkins, the Plaintiff spoke with Rozycki in the hallway. Senese testified, in pertinent part:

> I had brought up what [Hopkins] had said, and [Rozycki] said she knew about it, that [Hopkins] had brought it up to her days before, and that her advice was that since [Hopkins] witnessed the incident that she should come talk to me. … I said [to Rozycki], I don't believe I did anything wrong, and I said that you had seen me in crisis before, have you ever seen me do anything that you would construe as, you know, the allegations of [Hopkins]. She said no.

Senese also stated in his deposition that he informed Rozycki that Hopkins referred to him during their previous conversation as a "big guy" and informed him that he should be careful around children. The Plaintiff did not tell Rozycki that he felt it was inappropriate because he felt it was implied. Rozycki did not recall the Plaintiff mentioning such a comment. When the Plaintiff

asked if Hopkins' conversation would result in him being written up, Rozycki assured him that he would not be, and advised him not to lose sleep over it.

Two days later, on Wednesday, April 29, 2015, Chudyk called Hopkins to discuss her concerns regarding the Plaintiff's interactions with students during that month. She had previously spoken with Columbia and relayed this conversation to Hopkins. She discussed three separate incidents with Columbia regarding the Plaintiff: (1) when he became angry with a student who showed his food to another student and would not watch a movie in class after a field trip; (2) when he grabbed a student by his/her collar and placed his hand around that student's neck; and (3) when a student was stimming, which is the repetition of movements, sounds or objects, the Plaintiff grabbed her wrists, placed them on the desk, and put enough pressure on them with his fingers, that the student audibly complained. During her conversation with Hopkins, Chudyk specifically stated that she observed the Plaintiff, "[p]inching, [holding] wrists, holding hands, [grabbing the] shoulder area, and grabbing one student by the shirt, by the neck area." Chudyk did not allege that the students received physical injuries in these instances. Chudyk also informed Hopkins that she felt unease with the way he interacted with her in the classroom. She testified that she waited approximately one week before telling Columbia and Hopkins because (1) she felt intimidated by the Plaintiff; (2) he was well liked; and (3) she feared she would not be believed. At the end of the conversation, Hopkins informed Chudyk that she needed to discuss these concerns with Rozycki.

Later that evening, Hopkins received a phone call from Grasso, who relayed her own concerns regarding the Plaintiff's classroom behavior. During her deposition, Hopkins testified that,

> [Grasso] shared with me what she observed in the classroom. She gave several examples of holding of the hands, holding of the wrists, holding of the shoulders. She gave examples with [Student A] specifically that she came in off the school bus one morning into the classroom, was lying on the carpet area, had kicked [Senese] because he had been standing over where she was laying. She had kicked him and then he in turn kicked her. And her words, "With such force that the child spun around on the carpet."

At the conclusion of the conversation, Hopkins texted Rozycki to indicate that she wished to speak with her.

On April 30, 2015, Hopkins informed Rozycki that she spoke with Chudyk and Grasso the day before and indicated that they had information that they needed to discuss with her. In accordance with District procedure, Rozycki began an investigation into the allegations that day. Both Chudyk and Grasso met with Rozycki on April 30, 2015. Chudyk, who was the first to be called to Rozycki's office relayed the following information, according to Rozycki:

> Chudyk said that the atmosphere in [Senese's] classroom was very tense. That he was often intimidating to the staff in the classroom. People were uncomfortable. The staff in the classroom was uncomfortable. She said she had seen the squeezing of the hands, to my best recollection. That she often saw him yelling at children and being rude to staff members in the classroom. … She also relayed that he often made her feel very uncomfortable. She also relayed very often in the classroom[] lots of movies were being watched. That instruction only went on when an administrator was in close proximity.

Grasso was also called to Rozycki's office. According to Rozycki, Grasso indicated that she had witnessed a series of incidents over the past few weeks that made her feel uncomfortable. She reported that she saw the Plaintiff angry with the children often, that she witnessed him squeezing their wrists, kicking a child, and grabbing another by the collar.

Rozycki then called Schuster to inform him of the accusations and ask him to come to her office. When he arrived, they proceeded to ask additional staff to report to the office and answer questions. These staff members included Rider, Glover and Xiomarra Camara ("Camara"). Rider reported a disagreement with the Plaintiff regarding the reporting of a child's eating habits to the

parents. The Plaintiff told Rider to mind her own business or he would call her supervisor and have her fired. Glover and Camara stated to Rozycki that they had nothing to report regarding the Plaintiff's classroom behavior. At some point that day, the Plaintiff noticed that aides in his classroom were being pulled out of class and he inquired to Rozycki if anything was wrong. Rozycki informed the Plaintiff that there were accusations made against him. The Plaintiff was later removed from his classroom and placed in a conference room, where he, along with a union representative, met with Rozycki and Schuster. At that time, he was presented with the allegations and summarily denied them.

At some point in the afternoon, Rozycki emailed Dr. Michael Lonergan ("Lonergan"), the District's Superintendent of Schools, to inform him of the status of her investigation. Rozycki agreed to interview a teacher's aide from the 2013-2014 school year the next day. She then completed and faxed Lonergan a Child Abuse in the Educational Setting Form ("Child Abuse Form"). In the Child Abuse Form, Rozycki listed Grasso, Chudyk and Hopkins as reporters, and specifically alleged that the Plaintiff, "Squeez[ed] shoulder with pressure[, s]queez[ed] wrists with pressure and restraint[, k]ick[ed] student's leg[, p]inch[ed] a child under his chin[, and r]estrain[ed] a student with inappropriate maneuver." Under the portion of the Child Abuse Form entitled, "Administrator Use Only," Rozycki placed an "X" next to "Reasonable Suspicion."

Based on the information on the Child Abuse Form, Lonergan immediately placed the Plaintiff on administrative leave pending the results of the investigation. The Plaintiff was told by the District that during a period of administrative leave, he was not allowed to contact students, parents, or staff, nor enter district property without prior approval. However, at that time, Lonergan did not believe the information detailed in the Child Abuse Form rose to the level of what the New York State Education Department ("NYSED") defines as an injury so as to mandate

a report of child abuse in an educational setting. The relevant portion of the Child Abuse Form that depicts the signatures of Rozycki and Lonergan is displayed below:

| FOR ADMINISTRATOR USE ONLY | FOR SUPERINTENDENT OF SCHOOL USE ONLY |
|---|---|
| Reasonable Suspicion ☒ Yes ____ No | Reasonable Suspicion ____ Yes ☒ No |
| Date Submitted to Superintendent 4 /30 / 15 | Date Submitted to Law Enforcement / / |
| Name/Signature *Janine Rozycki, J. Rozycki* | Name/Signature *Lonergan* |
| Date Submitted to Law Enforcement / / | Date Submitted to Commissioner / / |
| Name/Signature _____ | Name/Signature _____ |

Lonergan had a personal day scheduled for Friday May 1, 2015, so he asked his secretary to set up interviews with the employees-at-issue during the following week. Lonergan's secretary set up the interviews for Wednesday, May 6, 2015.

The following day, Friday, May 1, 2015, Rozycki emailed Lonergan to report that she interviewed three of the Plaintiff's aides from the 2013-2014 school year. She informed Lonergan that two of the aides reported nothing, and one, Holzhauser, reported that in the prior year, the Plaintiff was rough with children, squeezed their hands, occasionally gave them soft kicks under the chair, and that overall she was uncomfortable around Senese. According to Rozycki, Holzhauser did not report this earlier because she was scared that no one would believe her and that she did not want to get him in trouble.

On Monday, May 4, 2015, the Plaintiff went to see his attorney, Saul Zabell (the "Zabell"). That day, the Plaintiff signed an affidavit. On May 4, 2015, at 5:49 p.m., Zabell faxed the District a Charge of Discrimination ("EEOC Charge") with the Equal Employment Opportunity Commission ("EEOC"). The District's Clerk stamped the EEOC Charge as received on Tuesday May 5, 2015, at 9:00 a.m. The District did not conduct an internal investigation relating to the allegations in the EEOC Charge. However, the District, through counsel, submitted a position

statement in response to the EEOC Charge. This response included a copy of the Child Abuse Form that both Rozycki and Lonergan completed.

The next day, on May 6, 2015, Lonergan and Dr. Allen Gerstenlauer ("Gerstenlauer"), a former Superintendent of School who at the time of the investigation had returned to the District as an interim Assistant Superintendent, interviewed Hopkins, Lopez, Chudyk, Rider, Grasso, and Holzhauser. A few employees, including Chudyk, became emotional during the interviews. Both Lonergan and Gerstenlauer took notes during the interviews, which specified that (1) Hopkins reported that the Plaintiff used an arm restraint on a child that Hopkins felt did not fit the situation; (2) Lopez reported that the Plaintiff had been demeaning and condescending to her and was unpleasant to work with; (3) Holzhauser repotted that the Plaintiff did not want to hurt the students, but would grab them too hard; (4) Chudyk reported that the Plaintiff had a short fuse and used his hands with the kids; (5) Rider reported seeing the Plaintiff behave aggressively with a child on two occasions; and (6) Grasso reported the Plaintiff's physical contact with students, including kicking a child.

On May 8, 2015, Lonergan met with Chris Powers of Inergerman Smith ("Powers"), the District's general counsel. In this meeting, Powers told Lonergan, "[t]his is a very serious matter. This needs to be communicated to the State and the police department." At this point, Lonergan believed the matter needed to be reported and directed James Perrotta, the Director of School Safety, to contact the Suffolk County Police Department, which he did that day. Hopkins also spoke to the police regarding the Plaintiff. At the time, she was unaware of any complaint by Senese either against her or the District. The Plaintiff was not contacted by the police and was not arrested in connection with the District's complaint.

On May 11, 2015, Lonergan spoke with Bart Zabin ("Zabin"), a NYSED Investigator about the Plaintiff and sent him the Child Abuse Form as he had received it from Rozycki. On June 25, 2015, Zabin advised Michael Gargiulo, an Assistant Superintendent for Human Resources, that NYSED would not pursue a Part 83 case and that the allegations as reported did not rise to the level of child abuse in the educational setting.

On June 18, 2015, Lonergan met with the Plaintiff and the president of the teacher's union. Unbeknownst to anyone there, the Plaintiff recorded the meeting. At that meeting, the Plaintiff asked the president of the teacher's union of he felt that the District was retaliating against him. The union president responded, "no."

**6.  Communication with Trustees of the Board of Education**

Matt Simonton ("Simonton"), a physical education teacher at Ridge, spoke to two members of the Board of Education for the District while the Plaintiff was on administrative leave. On May 1, 2015, Simonton spoke to Paul Infranco ("Infranco") and Michael Loguercio ("Loguercio"). According to Simonton, during a brief phone conversation with Infranco, he assured Simonton that "facts will work themselves out." Simonton's account of the conversation with Loguercio revealed almost identical advice.

However, Simonton contends that during a conversation with Loguercio, he brought up a possible lawsuit by the Plaintiff. Simonton asserts that while he cannot recall the exact language, Loguercio "said it wouldn't be in [Senese]'s best interest to file the claim or the lawsuit. He felt that that would ensure his termination." Loguerico does not recall discussing potential legal action with the District. Further, Loguercio did not inform Lonergan of his conversation with Simonton nor did he reveal the contents of his discussion with Simonton.

## 7.  The Plaintiff's Termination

On June 19, 2015, the day after the meeting with the Plaintiff and the teacher's union president, Lonergan wrote the Plaintiff a letter informing Senese that he was recommending that the Board of Education terminate Senese's probationary employment.  Six days later, the Plaintiff's counsel sent Lonergan a letter requesting the reasons for the termination recommendation.  On July 2, 2015, Dr. Lonergan wrote a letter detailing the reasons for his recommendation.  In pertinent part, the letter states that,

> Overall [Senese]'s overall performance as a probationary teacher has not met my expectations of excellence in professional competence, particularly in the area of student supervision.  There have been noted deficiencies in the following areas: [1.] Failure to protect the health and safety of all students[; 2.] Exercising poor professional judgment in the interactions with disabled students[; 3.] Inability to establish and reinforce professional boundaries between students and yourself[; and 4.] inability to consistently maintain classroom management procedures and routines, resulting in inappropriate behavioral interactions with students; thereby diminishing the respect of the students and colleagues.

The Plaintiff was afforded the opportunity to submit a written response to Lonergan's July 2, 2015 letter, but he did not do so.  On August 5, 2015, the District's Board of Education voted to terminate the Plaintiff's employment, effective August 31, 2015.

During the Plaintiff's administrative leave, Chudyk applied for a special education teaching position for the 2015-2016 school year.  The District hired 13 new special education teachers in July and August 2015 for the following school year, including Chudyk.  Of the 13 new special education teachers that were hired by the District, three are males.  These three new male probationary teachers were not placed at Ridge Elementary.  Chudyk was placed by the District in the Plaintiff's former position at Ridge.

The Plaintiff contends that the accusers are lying and are motivated by personal gain as well as the Plaintiff's gender.  This accusation is the Plaintiff's "gut feeling."

## B. The Procedural Background

On December 18, 2015, the Plaintiff commenced this action against the Defendants by filing a complaint in this Court. The Defendants answered the complaint on February 22, 2016. On March 8, 2016, the Plaintiff filed his first amended complaint. Thereafter, the parties entered into a stipulation and the Defendants answered the following day. The Plaintiff filed the second amended complaint, which is the current operative complaint for this action on July 23, 2016. He asserted seven separate causes of action for gender discrimination and retaliation in violation of Title VII and the NYSHRL. In connection with these claims, he seeks compensatory damages; punitive damages; a declarative order; an injunction enjoining the continuance of the Defendants' acts; attorneys' fees; interest; and costs. On October 4, 2016, the Plaintiff sought leave to file a third amended complaint to add aiding and abetting claims against the District's lawyers. The Court referred this motion to Magistrate Judge Anne Y. Shields, who denied the request as futile.

On December 1, 2017, the Defendants filed the instant motion for summary judgment seeking dismissal of the Plaintiff's claims.

## II. DISCUSSION

### A. Standard of Review: Fed. R. Civ. P. 56

Pursuant to Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Kwong v. Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine*

*Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In considering a summary judgment motion pursuant to Rule 56, the Court must "view the evidence in the light most favorable to the non-moving party … and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'"  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted); *see also Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007) (noting that in deciding a summary judgment motion, the court will "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all inferences and resolv[e] all ambiguities in favor of the nonmoving party"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (stating that in deciding a Rule 56 motion, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." (internal citations omitted)).

It is the movant's burden to initially demonstrate the absence of material facts that preclude summary judgment.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005) (citing *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)).  Such a "burden on the moving party may be discharged by 'showing' … that there is an absence of evidence to support the nonmoving party's case."  *PepsiCo, Inc. v. CocaCola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)).  If the moving party meets the initial burden, the nonmoving party must present specific facts that demonstrate there is a genuine issue that should be left for the fact-finder to decide.  *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); *see also Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-

87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (requiring the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts … the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" (internal citations omitted)).

It is not the Court's responsibility to resolve any purported issues of disputed facts, but merely to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (internal citations omitted); *accord Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012) (stating that the Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried"); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (noting that the responsibility of the district court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" (quoting *Anderson*, 477 U.S. at 249)). If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not present. *Anderson*, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. Conjecture, speculation, or conclusory statements are not enough to defeat summary judgment. *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citations omitted).

When allegations of discriminatory retaliation are at issue, a court must utilize "an extra measure of caution" in deciding whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006); *see also Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("Because writings directly

18

supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."); *Chin–McKenzie v. Continuum Health Partners*, No. 10–cv–3658, 2012 WL 2512942, at *6 (S.D.N.Y. June 29, 2012) (explaining why courts must use "an extra measure of caution" in summary judgment motions when evaluating evidence of discriminatory intent). Nonetheless, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Accordingly, in discrimination cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137. "[T]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997); *see Schnabel v. Abramson*, 232 F.3d 83, 90–91 (2d Cir. 2000); *Weinstock*, 224 F.3d at 42 (The question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." (internal citations and quotations omitted)); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (a plaintiff is required to "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'" (quoting *Woroski v. Nashua Corp.*, 31 F.3d

105, 110 (2d Cir. 1994))). In this circuit, the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock*, 224 F.3d at 41 (quoting *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir. 1994)) ; *see also Abdu Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## B. TITLE VII DISCRIMINATION CLAIM

The Plaintiff alleges that the District's decision to terminate him in the summer of 2015 was a pretext for discrimination. The Defendants argue that the Plaintiff cannot present a *prima facie* case because he has failed to present sufficient facts to raise an inference of discrimination. Additionally, they contend that the Plaintiff cannot show that the Defendants' proffered non-discriminatory reason was pretextual. For the reasons that follow, the Court finds that the Plaintiff has failed to present a *prima facie* case and is unable to demonstrate that the District's proffered reason was pretextual.

When there is no direct evidence of discrimination, Title VII discrimination claims are guided by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this analysis, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion."). To do so, a plaintiff must show, using evidence in the record, "(1) that she was within the protected [class], (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*

*v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010); *Holcomb*, 521 F.3d at 138 (same). "This burden is not a heavy one." *Id*; *accord Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (A plaintiff's burden at the *prima facie* stage to offer evidence of circumstances giving rise to an inference of discrimination is "'minimal' and '*de minimis*.'"

However, a *prima facie* case cannot be established using "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri*, 759 F.2d at 998. Establishing a *prima facie* case, "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

Once a plaintiff can demonstrate a *prima facie* case of discrimination, "the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason" for taking the adverse action. *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). "[I]f the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination." *Id*. A plaintiff "is not required to prove the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision." *Finn v. N.Y. State Office of Mental Health-Rockland Psychiatric Ctr.*, No. 08–cv–5142, 2011 WL 4639827, at *10 (S.D.N.Y. Oct. 6, 2011) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001)). He or she "must show that those were not the only reasons and that plaintiff's protected status contributed to the employer's decision." *Id*; *accord Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) ("An employee who alleges status-based discrimination under Title VII ... [is required to] show that the motive to discriminate was one of

the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("In proving a case under Title VII, following the defendant's proffer of a justification, a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." (internal citations omitted)). The Supreme Court explained:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

> Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–49, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations omitted). The Second Circuit recently clarified *Reeves*, noting that a case-by-case analysis is required for summary judgment:

> [W]e conclude that *Reeves* prevents courts from imposing a per se rule requiring in all instances that a [Title VII] claimant offer more than a prima facie case and evidence of pretext.... But the converse is not true; following *Reeves*, we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

*Schnabel*, 232 F.3d at 90 (internal citations omitted).

## 1. Whether the Plaintiff has Established a *Prima Facie* Case of Gender Discrimination

It is undisputed that the Plaintiff satisfies the first three prongs of his *prima facie* gender discrimination claim: he is a member of a protected class; was qualified for his position as a probationary teacher at Ridge; and suffered an adverse employment action when he when he was suspended and ultimately terminated. Accordingly, the Court will focus on the only element at issue: whether the surrounding circumstances give rise to an inference that the Plaintiff's suspension or termination arose out of gender discrimination.

"The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' *i.e.*, a discriminatory reason." *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 878 (2d Cir.1997) (citing *Fields v. New York State Office of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 119 (2d Cir.1997)). "A plaintiff can meet that burden through direct evidence of intent to discriminate, or by indirectly showing circumstances

giving rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). (internal citations omitted). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Discrimination may also be established by "creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Vega*, 801 F.3d at 87.

Among the various theories used to advance a claim of employment discrimination are "disparate treatment" and "disparate impact." To demonstrate "disparate treatment," a plaintiff "is required to prove that the defendant had a discriminatory intent or motive." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988). This proof can be either circumstantial or by presenting direct evidence. The Plaintiff alleges that his gender discrimination was predicated on disparate treatment.

### a. Disparate Treatment

The Plaintiff's allegations of discriminatory treatment do not support the proposition that the District took action because of Senese's gender. On the contrary, they arise from specific, serious complaints of misconduct by multiple District employees which resulted in an investigation, suspension, and termination. While Senese disputes the accusations, the District's response to them cannot reasonably be construed as the result of discriminatory animus.

The Plaintiff alleges that he was treated differently than his female counterparts, supporting an inference that his suspension and termination were motivated by gender discrimination. "A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *accord Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) ("'Disparate treatment' such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) ("A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably."); *Seale v. Madison Cty.*, 929 F. Supp. 2d 51, 67 (N.D.N.Y. 2013). An employee is similarly situated to other employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citing *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir.1997)). In other words, the employees must be similarly situated "in all material respects." *Id*. at 39; *see also Quinby v. WestLB AG*, No. 04–cv–7406, 2007 WL 1153994, at *7 (S.D.N.Y. Apr. 19, 2007). It requires "a reasonably close resemblance of facts and circumstances." *Id*. at 40.

In the instant case, Senese specifically alleges that the District's investigation into the accusations that he mistreated students gave rise to an inference of discriminatory intent.

However, the Plaintiff has not identified a single similarly-situated female employee. *See, e.g.*, *Hakeem v. Parkinson*, No. 3:10-cv-747, 2012 WL 234003, at *5 (D. Conn. Jan. 25, 2012) (granting summary judgment because the plaintiff provided "no factual support that a single alleged comparator performed similar job functions, was subjected to the same disciplinary standards, engaged in similar conduct, or was treated more favorably"). "Without this necessary evidence of similarly situated comparators, Plaintiff cannot meet [his] burden of demonstrating circumstances that give rise to an inference of [gender] discrimination." *Id.* During the 2014-2015 school year, the District employed 18 tenured male special education teachers and 91 female tenured special education teachers. Yet, the record does not contain any evidence of a female employee who was accused of mistreating her students but was not terminated. The fact that Senese has been accused by multiple co-workers of inappropriate behavior in his classroom clearly distinguishes the Plaintiff from other District employees who had never faced such accusations. The Plaintiff fails to even identify *any* female employee that was *either* terminated *or* accused of mistreatment.

Even if the Plaintiff did identify a female employee that met those requirements, the employee would have to be "subject to the same performance evaluation and discipline standards." In the context of this case, any similarly situated employee would have to be a probationary employee. A probationary employee is subject to being disciplined or terminated in a fundamentally different manner than permanent employees. During the relevant time, Senese was the only probationary special education teacher at Ridge and the record does not reflect whether there were other probationary special education teachers in the District.

Any claim by the Plaintiff that Chudyk, a defendant in this case, is similarly situated, is erroneous. Chudyk's repeated attempts to apply for a teaching position in the District are irrelevant to whether she is similarly situated to the Senese. The Plaintiff has failed to allege any misconduct

by Chudyk, let alone accusations of student mistreatment. *See Shumway*, 118 F.3d at 64 ("To demonstrate that similarly situated males were treated differently, [plaintiff] has to show that these [employees] engaged in comparable conduct. In [plaintiff's] case, her misconduct included a long term relationship, harassing behavior, and lying.").

The Plaintiff's failure to identify a similarly situated employee who faced similar accusations, but were permitted by the District to remain employed precludes an inference of discrimination. *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 495 (2d Cir. 2010) ("Because [the plaintiff] has not identified a similarly-situated employee who faced equally serious allegations and whom [the employer] allowed to remain on the job, [the plaintiff] has failed to raise an inference of discrimination."); *Garrett v. Mazza*, No. 97 Civ. 9148(BSJ), 2010 WL 653489, at *7 (S.D.N.Y. Feb. 22, 2010) (noting that the Court may grant a motion for summary judgment "where it is clear that no reasonable jury could find the similarly situated prong met." (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001))); *Chan v. New York Univ. Downtown Hosp.*, No. 03 Civ. 3003, 2006 WL 345853, at *5-6 (S.D.N.Y. Feb. 14, 2006) (holding that the Plaintiff's failure to identify any similarly situated employees and her conclusory allegations fail to raise an issue of fact).

### b. Direct Evidence

As the Plaintiff failed to establish disparate treatment, Senese must point to direct evidence that creates a genuine issue of fact in order for his claim of gender discrimination to continue. The record lacks such direct evidence as the Plaintiff has not demonstrated that any of the actions taken by the District were because of his gender. The Plaintiff points to the fact that Senese was the only male ALP teacher employed at Ridge during the tenure of his employment, and that there were only three male teachers at Ridge during the same time. However, "[w]ithout considerably more

analysis and interpretation of why and how it came to be that Plaintiff was the only [male ALP teacher at Ridge], that fact in isolation is of limited value to the Court." *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 329 (S.D.N.Y. 2007). These observations are insufficient to establish a *prima facie* case of discrimination. *Id.* (finding that the Plaintiff's allegation that he was the only African-American at a given location for a one-year period was insufficient evidence of *prima facie* discrimination). Further, "[w]ith respect to the immediate circumstances surrounding [Senese's] termination, there is no evidence in the record to support an inference of [discriminatory intent] on the part of … the ultimate decision-maker." *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012) (collecting cases).

The Plaintiff cites no comments by any decision-makers that provide a basis for this Court to infer discriminatory intent. He claims in his deposition that Hopkins' stated: (1) that "as a big guy" the Plaintiff should be especially careful when dealing with children; (2) that "as a man in the school you have to be that much more careful than anybody else;" and (3) that "it was inappropriate for a man to take a student to the bathroom." These comments, however, fail to give rise to an inference of discrimination. In this analysis, the Court must consider: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry*, 616 F.3d at 149-50.

These comments were not made by a decision-maker, but they were made by one of the Plaintiff's supervisors. Neither came with any disciplinary action, and both were in the context of teaching advice provided by an experienced assistant vice principal who was attempting to instruct

a teacher.  The comments themselves along with their context reveal their benign nature.  The Plaintiff is 6'2" and approximately 250 pounds and, in the incident that prompted the first and second alleged comment, physically restrained an elementary-aged girl.  As the Plaintiff makes clear in his deposition, Hopkins called Senese a "big guy" and reminded him to "be that much more careful" as a man in the context of restraining a young student.  In that conversation, as described by the Plaintiff, it is clear that Hopkins reference to the Plaintiff's gender is to remind him of his comparative strength compared to the student.  It is appropriate, and even wise, for a supervisor to remind a teacher of his or her superior stature and strength in such situations, for the propensity for injury is heightened with younger students.  As an adult male, the Plaintiff's strength, on average, exceeded that of his female colleagues.  A study published in the European Journal of Applied Physiology revealed that the women were approximately 52% and 66% as strong on average as the men in the study in their upper and lower bodies respectively.  A. Miller et al., *Gender Differences in Strength and Muscle Fiber Characteristics*, 66(3) EUR. J. APP. PHYSIOLOGY 254 (1993).  Based on her training and experience, Hopkins saw Senese exercise a level of physical restraint that she deemed excessive, and she had a conversation about the proper level of force required to physically restrain a young student, given the relative size and strength of the teacher and student.

   The third remark occurred after Hopkins witnessed the Plaintiff in a stall with one of his male students.  When Hopkins inquired as to the situation, the Plaintiff explained that the female aides were uncomfortable taking this particular student to the bathroom.  At that time, Hopkins told the Plaintiff, "[J]ust as I would tell anybody, please step into the threshold of the bathroom and not be in the stall with him because, again, you're putting yourself at risk as misinterpretation as to why you're in the stall with him."  While the Plaintiff does not recall this incident, he does

not deny it.  The following year, in the same conversation as the first two comments, Hopkins reminded Senese that "it was inappropriate for a man to take a student to the bathroom."  These remarks are only tangentially related to gender, and there is no evidence in the record that they were made in a context that can be construed as related to the District's decision-making process that resulted in the adverse employment actions.

Further, these three comments are too vague to demonstrate a discriminatory state of mind. *See Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008) (deciding that a comment was "simply too vague, and too susceptible to any number of benign meanings, to constitute evidence of … discrimination").  "Nor do these comments rise to the legal of invective held to be sufficient to constitute discriminatory intent in this circuit." *Rodriquez-Cross v. Sessions*, No. 3:16-cv-00633, 2018 WL 3213290, at *15 (D. Conn. June 29, 2018) (collecting cases).  The Court cannot conclude that these comments demonstrate an inference of discrimination.

The Plaintiff's claim that there is an inference of discrimination is also undercut by the fact that Lonergan, the Superintendent who suspended the Plaintiff and recommended his termination, is a man.  "Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee." *Bauger v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393, 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010); *accord Morris v. N.Y. City Dep't of Sanitation*, No. 99 Civ. 4376, 2003 WL 1739009, at *7 (S.D.N.Y. Apr. 2, 2003) ("Where all decision-makers are members of a plaintiff's protected class, courts have found an inference against discriminatory intent.").

Finally, Senese's disagreement with the District regarding the nature of his conduct is irrelevant for the purposes of his discrimination claim as long as the District had a good faith belief that his conduct was inappropriate. *See Hargett v. N.Y. City Transit Auth.*, 640 F. Supp. 2d 450,

475-76 (S.D.N.Y. 2009), *aff'd sub nom. Hargett v. Metro. Transp. Auth.*, 381 F. App'x 12 (2d Cir. 2010). The District, as the Plaintiff's employer, has the ability to suspend or terminate an employee based on subjective business judgments, as long as they are not discriminatory. Therefore, the Plaintiff's arguments concerning Chudyk's alleged desire to replace him or the disagreements with Hopkins on the proper CPI technique are irrelevant, as Senese has not submitted any evidence to demonstrate that their conduct was motivated because of his gender.

Accordingly, Senese, has failed to establish a *prima facie* case of discrimination.

## 2. Whether the District has a Legitimate, Non-Discriminatory Explanation

Assuming, *arguendo*, that Senese could establish a *prima facie* case of gender discrimination regarding his suspension and termination, it would be the District's burden to demonstrate a legitimate, non-discriminatory reason for those actions. To do this, the Defendants argue that Senese was suspended and ultimately terminated because of a series of serious allegations regarding the mistreatment of students, which was reported by multiple employees. "[C]ourts have consistently held that they may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination. Federal courts do not hold a roving commission to review business judgments." *Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250, 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1989)). As the District has proffered a legitimate, non-discriminatory reason for the Plaintiff's suspension and termination, the Court next considers whether they were pretextual.

## 3. Whether the District's Reasons are Pretextual

Once the Court determines that the District has proffered a legitimate, non-discriminatory reason, the Plaintiff must introduce evidence from which a reasonable jury could decide, by a

preponderance of the evidence, that discrimination played a role in the District's adverse actions. *See Holcomb*, 521 F.3d at 141 ("We now ask whether, without the aid of the presumption, [the plaintiff] has raised sufficient evidence upon which a reasonably jury could conclude by a preponderance of the evidence that the decision to fire him was based, at least in part, on the fact that his wife was black."). In the Second Circuit, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating factors.'" *Id*. at 138 (citing *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)). At this stage, "[c]onclusory and speculative allegations will not suffice to demonstrate discriminatory intent." *Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012). Here, "[a] court may re-consider evidence presented to find an inference of discrimination at the prima facie stage." *Ingenito v. Riri USA, Inc.*, No. 11-CV-2569, 2013 WL 752201, at *12 (E.D.N.Y. Feb. 27, 2013); *see also Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("[T]he plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more."). However, "[t]he burden of establishing pretext is higher than that required to establish a prima facie case of discrimination." *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 328 (E.D.N.Y. 2015).

The Plaintiff's primary argument is that the investigation was "little more than a witch hunt." The Court disagrees. The District's investigation was not limited to Hopkins and Chudyk, as the Plaintiff contends. Rozycki interviewed Hopkins, Chudyk, Rider, Holzhauser, Glover and Camara. Glover and Camara never observed the Plaintiff engage in any inappropriate behavior. However, Chudyk, Holzhauser, Rider, and Hopkins did observe such behavior. The Plaintiff has

not accused either Holzhauser or Rider of either discriminatory or personal biases. He does accuse Hopkins and Chudyk as having "discriminatory or personal bias" against him.

Title VII does not prohibit adverse employment actions motivated by personal biases; it forbids adverse employment actions *motivated by discrimination*. It is wholly irrelevant whether either had personal biases against Senese. His accusations that Chudyk harbored ill-will toward the Plaintiff for receiving a job offer over her have no bearing on a Title VII cause of action. As noted above, the Plaintiff has introduced no evidence that Chudyk's alleged ill-will was *motivated by discrimination*. Further, as discussed above, Senese's accusations of discriminatory biases against Hopkins are baseless. Lonergan properly placed Senese on administrative leave while the District conducted a thorough investigation as to the serious, distressing accusations against him.

None of the four stated reasons for the Plaintiff's termination were pretext for his termination. Senese relies heavily on his CPI certification, arguing that Hopkins' and Lonergan's "lack of knowledge of current CPI techniques does not allow them to properly assess … Plaintiff's interactions with students." This assertion is erroneous. The District's administration is called upon to evaluate and discipline teachers who are certified in a variety of subjects, ages, and techniques. Administrators, like other managers or executives, use their training and experience to assess situations and make appropriate decisions. If school districts only allowed those with a current certification in every pertinent subject or technique assess or provide feedback regarding a given situation, school districts around the country would be left with empty administration buildings. Moreover, Hopkins had received CPI training in the past. However, her certification had lapsed at the time she discussed CPI techniques with the Plaintiff. She is fully qualified, as an experienced administrator with prior CPI training to view such a situation and determine if a situation is improper.

33

Even if the Court agreed with the Plaintiff, and discounted everything that did not come from a current CPI instructor as "conjecture and speculation," the glaring lack of evidence that the District's actions were *due to gender discrimination* remains. If the Defendants and other witnesses were ignorant as to the proper CPI training, and overreacted when they witnessed the Plaintiff throughout his tenure at the District, then they were uninformed, not necessarily prejudiced. The Plaintiff would have this Court disregard all the witnesses and participants in this investigation merely because they lacked a current CPI certification at the time. The Court refuses to do so.

As this Court stated above, Senese has offered no evidence that his suspension or termination was the byproduct of discrimination. Accordingly, the Plaintiff's discrimination claim under Title VII is dismissed with prejudice.

## C. TITLE VII RETALIATION CLAIM

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *see Hicks*, 593 F.3d at 166. Thus, an employer is barred "from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567-68 (2d Cir. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56, 59, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)) .

In adjudicating Title VII retaliation claims, courts use the *McDonnell Douglas Corp.* burden-shifting framework. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.

2005). In order to present a *prima facie* case of retaliation under Title VII, Senese must establish "(1) that [he] participated in an activity protected by Title VII, (2) that [his] participation was known to [his] employer, (3) that [his] employer thereafter subjected [him] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). As with Title VII discrimination claims, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 316; *accord Jute*, 420 F.3d at 173 ("In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."). A *prima facie* case of retaliation is established when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

If the employee can satisfy the initial burden, a "presumption of retaliation" arises, and the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the given adverse employment action. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). If the employer produces evidence of a non-retaliatory justification, then the employee must "show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision" or that the employer's reason was pretextual. *Id.* (citing *Nassar*, 570 U.S. at 360). However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [i]s untrue and

there [i]s abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," the employer is entitled to judgment as a matter of law. *Reeves*, 530 U.S. at 148.

**1. Whether the Plaintiff has Established a *Prima Facie* Case of Retaliation**

Senese's retaliation claims are based on his suspension on April 30 2015, his termination on August 5 2015, as well as the filing of a report with the Suffolk County Police Department on May 8, 2015 and the notification of the NYSED on May 11, 2015. He alleges that those acts were taken in retaliation for an alleged conversation between Senese and Rozycki that took place on April 27, 2015 and the May 4, 2015 EEOC Charge.

The Defendants assert that the Plaintiff's conversation with Rozycki on April 27, 2015 does not constitute a protected activity. The Court agrees.

Under Title VII, a plaintiff is not required to demonstrate that the conduct being opposed is unlawful, merely that he has a reasonable belief that he was opposing a practice prohibited by Title VII. *See Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) ("As to the 'protected activity' element of a Title VII … retaliation claim, the plaintiff need only 'have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001))); *Rosioreanu v. City of N.Y.*, 526 F. App'x 118, 120 (2d Cir. 2013) ("'[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood,' that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by Title VII." (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev't Corp.*, 136 F.3d 276, 292 (2d Cir.1998))); *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of

was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))).

The Plaintiff's complaint of discrimination is not required to be a formal one; it may also be informal. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))); *Sumner*, 899 F.2d at 209 (explaining that a protected activity includes not only formal complaints, but "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges"). "However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII. Generalized complaints about a supervisor's treatment are insufficient." *Risco*, 868 F. Supp. 2d at 110 (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).

In the instant case, the Plaintiff contends that on April 27, 2015, the Plaintiff spoke with Rozycki regarding his conversation with Hopkins earlier that day. Senese approached Rozycki while on the way to the restroom, and according to his deposition,

> I had brought up what [Hopkins] had said, and [Rozycki] said she knew about it, that [Hopkins] had brought it up to her days before, and that her advice was that since [Hopkins] witnessed the incident that she should come talk to me. … I said

[to Rozycki], I don't believe I did anything wrong, and I said that you had seen me in crisis before, have you ever seen me do anything that you would construe as, you know, the allegations of [Hopkins]. She said no.

In the Court's view, this conversation fails to satisfy the "protected activity" requirement of his *prima facie* case. Senese merely informed Rozycki about the conversation he had with Hopkins. In his conversation with Rozycki, he did not contend that any of Hopkins' comments were inappropriate or discriminatory. Therefore, Rozycki could not have reasonably understood this to be a complaint about gender discrimination. Senese did not demonstrate that he "had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *McMenemy*, 241 F.3d at 285). His lack of specificity prevented the employer from being "on notice" that Senese believed he was being discriminated against on the basis of his gender. *Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." (citing *Ramos v. City of N.Y.*, No. 96 Civ. 3787(DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997))).

Therefore, the Court finds that the April 27, 2015 conversation with Rozycki does not constitute a protected activity for the purpose of demonstrating a *prima facie* case of retaliation. The May 4, 2015 EEOC Charge is the only action that constitutes a protected activity in this matter. *See, e.g.*, *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 223 (E.D.N.Y. 2014).

Accordingly, the Plaintiff has established a *prima facie* case with respect to Senese's EEOC Charge.

### 2. Whether the District had a Legitimate, Non-Retaliatory Explanation

Even assuming the Plaintiff establishes a *prima facie* case with respect to both the EEOC

Charge and his conversation with Rozycki, the District has offered a legitimate, non-retaliatory reason for the adverse actions. "Once the plaintiff has made such a prima facie showing, the burden shifts to the employer to come forward with a nondiscriminatory reason for the decision not to hire the plaintiff." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). The District claims that the investigation that began on April 30, 2015, which yielded reports from various employees of alleged inappropriate activity in the classroom, provided that legitimate, non-retaliatory reason to file a report with the Suffolk County Police Department, notify the NYSED, as well as, suspend and ultimately terminate Senese. This investigation, which was conducted by multiple supervisors, resulted in a variety of disturbing accusations from numerous fellow teachers against a probationary employee. The District has satisfied its burden of production in articulating a non-retaliatory reason for the adverse actions taken against the Plaintiff.

### 3. Whether the Plaintiff has Established But-For Causation

As the District has presented sufficient evidence to satisfy the second step, the burden shifts back to the Plaintiff to establish that but for his protected activities, the District would not have taken adverse action against him.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation. … This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (explaining that but for causation "is not equivalent to a requirement that [gender] was the employers *only* consideration, but rather that the adverse employment action[ ] *would not have occurred without it*" (emphasis in original)); *Kwan*, 737 F.3d at 845 ("[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or

'motivating' factor in the employer's decision." (citing *Nassar*, 570 U.S. at 360)); *Leacock v. Nassau Health Care Corp.*, No. 08–CV–2401 (DRH), 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013) ("[D]uring the final stage of the burden shifting frame-work, the plaintiff must show that retaliation was a but-for cause of the adverse employment action." (quoting *Dall v. St. Catherine of Siena Medical Ctr.*, No. 11-CV-0444 (MKB), 2013 WL 4432354, at *22 n.15 (E.D.N.Y. Aug. 14, 2013))). This may be accomplished "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Vega*, 801 F.3d at 90-91.

The Plaintiff proffers four arguments to attempt to establish a causal connection: (1) temporal proximity; (2) the investigation and allegations are speculative; (3) Lonergan allegedly changed his mind about reporting the allegations to the authorities following his receipt of the EEOC Charge; and (4) a board member's conversation with a teacher.

Initially, the Plaintiff cannot meet his burden to show causation using temporal proximity at the pretext stage. Furthermore, an examination of temporal proximity yields major defects in the Plaintiff's claim. Senese was suspended in April 30, 2015 and was terminated on August 5 2015, while his EEOC Charge was sent on May 4, 2015 and received on May 5, 2015. When Senese filed his EEOC Charge in early May 2015, the District's disciplinary process regarding his alleged inappropriate classroom behavior had already begun. At that time, Senese had already been suspended as a result of his alleged actions, and the District investigation was well underway. Since the evidence demonstrates that the suspension occurred prior to the protected activity, the Plaintiff cannot establish causation regarding his suspension.

Further, the record demonstrates that the District took steps to investigate the allegations prior to any knowledge of the EEOC Charge. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). While Senese's termination was finalized after the EEOC Charge, the District had already taken steps to discharge Senese as a probationary employee before the EEOC Charge was filed. The District's actions to begin the process of terminating his employment before he engaged in protected activity precludes the Plaintiff from relying on temporal proximity to satisfy causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Accordingly, the Plaintiff's first argument, based on temporal proximity, is insufficient.

Next, the Plaintiff contends that the investigation yielded only speculative, uncorroborated allegations. As discussed *supra* in Section II.B.3, the Plaintiff cannot satisfy his burden to show that the District's investigation, either procedurally or substantively, is pretextual. His reliance on the speculative assertion that the investigation was "a witch hunt" and that the resulting allegations were contrived is insufficient. *See generally Ozembhoya v. Edison Parking Corp.*, No. 02-CV-10057, 2007 WL 2593008, at *7 (S.D.N.Y. Sept. 7, 2007) ("An employer may sustain its employment decision without showing that the information on which it relied in its investigation was correct, but only that it reasonably relied on such information."). The Plaintiff failed to create a triable issue of fact regarding the integrity or results of the investigation. There is no evidence in the record that Senese the District's investigation was compromised either *because of* the Plaintiff's gender or any of the alleged protected activities.

Senese further alleges that Lonergan allegedly stated that he changed his mind about reporting the allegations to the authorities following his receipt of the EEOC Charge. The District has provided a legitimate, non-retaliatory reason for any "change of heart" by Lonergan. On May 8, 2015, Lonergan met with Powers, the District's general counsel. In this meeting, Powers told Lonergan, "[t]his is a very serious matter. This needs to be communicated to the State and the police department." Later that day, the District filed a report with the Suffolk County Police Department, and three days later, it notified of the NYSED. The Plaintiff counters that the District knew of the EEOC Charge prior to Lonergan's meeting with Powers, or either case of reporting the allegations to the authorities. However, as previously addressed, mere temporal proximity is insufficient at the pretext stage. The Plaintiff points to Lonergan's deposition as evidence of causation. The Court examined Lonergan's deposition in its entirety and concludes that no reasonable fact-finder could conclude that Lonergan decided to report the Plaintiff's behavior to the authorities based on the filing of the EEOC Charge.

Finally, in his opposition papers, the Plaintiff points to a conversation between a colleague and Loguercio, a member of the Longwood Central School District Board of Education Trustees, where Loguercio informed Simonton that, in his opinion, "it would not be in Plaintiff's best interest to file a lawsuit or action against Longwood as it would ensure his termination." However, it is undisputed that Loguercio never informed Lonergan of this conversation and it is not alleged that Loguercio discussed this with any other board member. While it was unwise for Loguercio to discuss a potential situation which might end up before the board, it was not the "but for" reason for Senese's termination.

The Plaintiff has failed to produce any evidence that would allow a reasonable factfinder to conclude that any of the District's proffered reasons for its adverse job actions are pretextual.

The Court cannot conclude that but for Senese's conversation with Rozycki and his filing of the EEOC Charge, the District would not have suspended or terminated him nor would they have alerted the authorities as to the allegations. There is no such evidence in this case.

As such, the Plaintiff's retaliation claim under Title VII is dismissed with prejudice.

## D. NYSHRL CLAIMS

The Plaintiff also brings claims for gender discrimination and retaliation under the NYSHRL. "[C]laims brought under [NYSHRL] are analytically identical to claims brought under Title VII." *Rojas*, 660 F.3d at 107 n.10 (internal citations omitted). The Court must determine whether to retain jurisdiction over the NYSHRL claims now that the Title VII claims have been dismissed. A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In employing its discretion, the district court balances the "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988). In the Second Circuit, "when the federal claims are dismissed the state claims should be dismissed as well." *In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (internal citations and quotations omitted). "Although this is not a mandatory rule, the Supreme Court has stated that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors … will point toward declining jurisdiction over the remaining state-law claims." *Id*. (citing *Cohill*, 484 U.S. at 350 n.7). As the Supreme Court noted in *United Mine Workers v. Gibbs*, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

As this Court has dismissed the Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ..."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994); *Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 758 (2d Cir. 1991). Accordingly, Claims II, IV, V, VI, and VII are dismissed without prejudice.

### III.  CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment pursuant to Rule 56 is granted as to the Plaintiff's Title VII claims (Claims I and III).  The remainder of the Plaintiff's claims are dismissed without prejudice.

The Clerk of the Court is respectfully directed to close the case.


It is **SO ORDERED**:

Dated:  Central Islip, New York

August 3, 2018

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge